WALLACE, Judge.
 

 Gregory Hagopian, a member of The Florida Bar, petitions this court for a writ of certiorari
 
 [1]
 
 to quash a circuit court order denying his motion to withdraw as counsel for Terry Green in a complex prosecution under the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, sections 895.01-.06, Florida Statutes (2008). Because Mr. Hagopian established grounds for withdrawal from the representation in accordance with rule 4-6.2, Rules Regulating The Florida Bar, we grant the petition and quash the circuit court’s order.
 

 I. THE FACTS
 

 A. Introduction
 

 In an effort to combat gang activity in Manatee County, the Statewide Prosecutor began charging persons alleged to be gang members with the offense of racketeering. Terry Green was one of the persons so charged. In 2008, an information was filed in the Manatee County Circuit Court charging Mr. Green and eleven codefen-dants with one count of racketeering and one count of conspiracy to commit racketeering. The circuit court appointed the public defender to represent one of Mr. Green’s codefendants and appointed the five Manatee County attorneys whose names appeared on the registry list maintained by the clerk of the circuit court to represent five more of the codefendants. The circuit court could not appoint the Office of Criminal Conflict and Civil Regional Counsel to represent Mr. Green or any of his codefendants because of a conflict of interest. As a result of the shortage of available attorneys to represent the remaining defendants in Mr. Green’s case and similar cases, the circuit court created an “Involuntary Appointment List” and began appointing attorneys whose names were placed on the Involuntary Appointment List to represent Mr. Green and other codefendants. The first two attorneys involuntarily appointed to represent Mr. Green were granted leave to withdraw because they lacked the requisite experi
 
 *628
 
 ence. The circuit court then appointed Mr. Hagopian- — a sole practitioner — from the Involuntary Appointment List to represent Mr. Green. Mr. Hagopian moved to withdraw from Mr. Green’s case, but the circuit court denied his motion. Mr. Hagopian now seeks review by certiorari of the order denying his motion to withdraw.
 

 B. Chapter 2007-62
 

 Some familiarity with chapter 2007-62, Laws of Florida, is necessary to understand the facts of this case. Chapter 2007-62 “creat[ed] a revamped system of court-appointed counsel to represent indigent defendants primarily in those cases in which the public defender has a conflict.”
 
 Crist v. Fla. Ass’n of Criminal Def. Lawyers, Inc.,
 
 978 So.2d 134, 137 (Fla.2008). To this end, chapter 2007-62 established five Offices of Criminal Conflict and Civil Regional Counsel (the OCCCRC). § 27.511(1), Fla. Stat. (2007);
 
 Crist,
 
 978 So.2d at 137. As was the case before chapter 2007-62, the public defender in each circuit has primary responsibility for representing indigent persons under arrest for, or charged with, a felony and in certain other matters. § 27.51(1);
 
 Crist,
 
 978 So.2d at 138. If the public defender is unable to represent an indigent person because of a conflict of interest, the new system requires that the OCCCRC be appointed to provide legal services to that person. § 27.511(5);
 
 Crist,
 
 978 So.2d at 138. If the OCCCRC is unable to provide representation because of a conflict of interest, then the court is required to appoint private counsel from a registry of individual attorneys. § 27.40(2);
 
 Crist,
 
 978 So.2d at 138.
 

 Chapter 2007-62 also made several major changes to the manner in which private counsel are compensated for their services on behalf of indigent clients.
 
 [2]
 
 First, chapter 2007-62 established a new flat fee system. Section 27.5304(5) provides in pertinent part:
 

 The compensation for representation in a criminal proceeding shall not exceed the following:
 

 (a) 1. For misdemeanors and juveniles represented at the trial level: $1,000.
 

 2. For noncapital, nonlife felonies represented at the trial level: $2,500.
 

 3. For life felonies represented at the trial level: $3,000.
 

 4. For capital cases represented at the trial level: $15,000. For purposes of this subparagraph, a “capital case” is any offense for which the potential sentence is death and the state has not waived seeking the death penalty.
 

 5. For representation on appeal: $2,000.
 

 This flat fee schedule obviously provides minimal compensation in cases that prove to be complicated or time-consuming for appointed counsel.
 

 Second, chapter 2007-62 recognized that it might be necessary to exceed the statutory máximums “on rare occasions” in cases “that require[] extraordinary and unusual effort.” § 27.5304(12). However, chapter 2007-62 established complicated and time-consuming procedures for obtaining a fee in excess of the statutory maximum. These procedures include pri- or notice to the Justice Administrative Commission (JAC), an opportunity for the JAC to review and object to the proposed billing, the filing of an appropriate motion,
 
 *629
 
 and a hearing before the chief judge of the circuit or a designee. § 27.5304(12)(a). At the hearing, the chief judge or designee is directed to “consider criteria such as the number of witnesses, the complexity of the factual and legal issues, and the length of trial.” § 27.5304(12)(b)(l). By itself, a trial does not “constitute competent!,] substantial evidence of an extraordinary and unusual effort.”
 
 Id.
 
 In criminal cases, fees exceeding the statutory máximums “may not be granted if the number of work hours does not exceed 75 or the number of the state’s witnesses deposed does not exceed 20.”
 
 Id.
 

 Furthermore, even if the chief judge or designee determines that the case required counsel to make extraordinary and unusual efforts, the compensation authorized under chapter 2007-62 is limited to twice the flat fee, unless the chief judge or designee determines that such an amount would be confiscatory, in which case the chief judge or designee may order compensation at a maximum hourly rate of $75 for noncapital cases and $100 for capital cases. § 27.5304(12)(d). We note that the maximum hourly rates of $75 for noncapital cases and $100 for capital cases are substantially below market rates for similar services.
 
 [3]
 

 Third, chapter 2007-62 eliminated interim billing. Under prior law, an attorney could request a judicial determination that a matter was “extraordinary and unusual” while the case was pending. If so, counsel’s services would be eligible for billing at an hourly rate, and the JAC could pay the attorney as the case progressed, usually at six-month intervals. § 27.5304(2), (10), Fla. Stat. (2006). Under chapter 2007-62, however, court-appointed counsel must not only wait until final disposition of the case to be paid but must also wait until final disposition to learn if payment for his or her services will qualify for the hourly rate.
 
 See
 
 § 27.5304(3), (12)(d).
 

 C. The Act’s Impact on the Criminal Defense Bar in Manatee County
 

 The circuit court described the effect of the changes made by chapter 2007-62 in the compensation system on the criminal defense bar as follows:
 

 Since the typical “extraordinary and unusual” case can be active for several months, if not years, and routinely consume hundreds of hours of professional time, the last sentence of section 27.5304(3) has proven to be an effective disincentive for the private bar. Few criminal defense lawyers are willing to risk the economic burden such an appointment would impose on their financial security, and gamble they will get fair compensation at the tail end of litigation.
 

 These uncertainties about payment led to a substantial reduction in the number of attorneys in Manatee County willing to accept appointments to criminal cases under a JAC contract. In May 2007, when the Act went into effect, there were approximately fifteen attorneys practicing in Manatee County on the registry list. A little over one year later, there were only five such attorneys. Of the five attorneys remaining on the JAC registry list, two attorneys declined to handle anything more serious than a second-degree felony. This left only three attorneys on the list who were available to defend persons accused
 
 *630
 
 of first-degree felonies or other more serious crimes.
 

 D. Targeting the Gangs: The Agustín and Brown Cases
 

 While these changes to the system for paying court-appointed private counsel in criminal cases were occurring, law enforcement agencies were initiating aggressive strategies to target the criminal activities of street gangs in Manatee County. These aggressive strategies led to a number of individual arrests. However, according to the circuit court, the filing of two multide-fendant cases was the factor that “had the most profound impact to date on the efficiency of circuit court operations.” The first case,
 
 State v. Agustin,
 
 Manatee Circuit Court Case No. 2007-CF-2565, was filed on July 6, 2007. The
 
 Agustín
 
 case named fourteen defendants. The second case,
 
 State v. Brown,
 
 Manatee Circuit Court Case No. 2008-CF-1665, was filed on May 7, 2008. The
 
 Brown
 
 case named twelve defendants.
 

 The
 
 Agustin
 
 and
 
 Brown
 
 cases are similar in nature. The Statewide Prosecutor filed both cases. In each case, the State charged multiple persons alleged to be gang members with one count of racketeering and one count of conspiracy to commit racketeering. Mr. Hagopian’s client, Terry Green, is one of the defendants in the
 
 Brown
 
 case.
 

 E. The Shortage of Available Attorneys
 

 The filing of these prosecutions against multiple defendants and the exodus of criminal defense attorneys from the registry list presented the circuit court with a serious problem. There was a shortage of attorneys available to represent the large number of defendants charged in these gang-related cases. The circuit court explained: “After the appointment of the public defender, [the OCCCRC], and the five remaining registry attorneys, the system breaks down when the number of attorneys needed to represent indigent co-defendants in Manatee County exceeds seven.” The actual shortage could be even worse than it might appear initially because of disqualifying ethical conflicts. For example, the OCCCRC could not be appointed to represent any of the codefen-dants in the
 
 Brown
 
 case because one of the lawyers in the OCCCRC had previously represented one of the important prosecution witnesses in the ease.
 

 F.The Creation of the Involuntary Appointment List
 

 To address the shortage of available attorneys, the chief judge of the Twelfth Judicial Circuit created an Involuntary Appointment List. In the order under review, the circuit court described the creation of this list and some of the results of its use as follows:
 

 [ T]he list was compiled from a Florida Bar membership roster which identified lawyers as criminal defense practitioners, and from phone book yellow pages, web pages and internet sites, attorneys who were on the former court appointed list, and from criminal division judges with knowledge of the defense bar.
 

 Attorneys placed on the Involuntary Appointment List by the Chief Judge were not vetted for experience, expertise, or with regard to whether the appointment would create a financial hardship. In fact, then* particular competence or fitness to represent defendants charged with first[-]degree felonies was not a consideration for eligibility. Attorneys who limit their practice to traffic and misdemeanor matters and never tried a case to a jury were lumped together with lawyers experienced in the most complex criminal cases.
 

 
 *631
 
 The lists are maintained by the Clerks in each county. When it appears an involuntary appointment is required, the Clerk supplies the name to the assigned division judge using an alphabetical rotation, and the order is entered. The form used in such cases allows attorneys to petition to withdraw for hardship or other good cause.
 

 They have made frequent use of this option, with the result that in both mul-ti-defendant cases,
 
 Agustín
 
 and
 
 Brown,
 
 there has been a succession of attorneys for some defendants, and the process has proven to be cumbersome and time-consuming ....
 

 [[Image here]]
 

 Mr. Hagopian is the third attorney under consideration in this case. The first was a new member of the [B]ar who candidly confessed to a lack of sufficient training or expertise to competently handle a serious crime like the RICO and conspiracy charges, and his résumé confirmed it. The second lawyer was mistakenly identified as a criminal law practitioner based on an outdated Manatee Bar Association roster, and is more accurately described [as] a family law and estate planning practitioner with no recent criminal law experience.
 

 The result of this process is that Terry Green, who was arrested on May 12, 2008 ..., has been waiting for over three months for the services of court appointed counsel.
 

 Sadly, the circuit court noted that Mr. Green’s situation is not unique. At the time of the entry of the order under review, the circuit court was experiencing similar delays and difficulties in obtaining counsel for other defendants in the
 
 Agustin
 
 and
 
 Brown
 
 cases.
 

 G. The Order Appointing Mr. Hagopian and His Objection
 

 On July 22, 2008, the circuit court entered an order in the
 
 Brown
 
 case appointing Mr. Hagopian to represent Mr. Green. Mr. Hagopian’s name was not on the registry list. In fact, Mr. Hagopian was one of the attorneys who had removed his name from the list after the passage of the Act. The circuit court selected Mr. Hagopian’s name from the Involuntary Appointment List.
 

 Mr. Hagopian promptly filed a motion to withdraw
 
 [4]
 
 and requested a hearing. In his motion, Mr. Hagopian asserted four grounds for relief. First, the compensation available under section 27.5304 would be insufficient to compensate him for the work necessary to provide effective representation to Mr. Green. Second, the inadequacy of the compensation would inevitably give rise to a conflict of interest between Mr. Hagopian and the client and deprive Mr. Green of his right to conflict-free counsel. Third, the vast scope of the work necessary to handle the case would cause Mr. Hagopian to be unable to properly represent his existing clients, render him unable to accept new business, and ultimately lead to the ruin of his law practice. Fourth, the involuntary appointment would deprive Mr. Ha-gopian of his constitutional rights to due process of law, the right to contract, and the rights of association and free speech.
 

 II. THE HEARING ON THE MOTION TO WITHDRAW
 

 The circuit court promptly conducted an evidentiary hearing on Mr. Hagopian’s motion to withdraw. In addition to Mr. Ha-gopian, three witnesses testified at the
 
 *632
 
 hearing: (1) Walt Smith, the trial court administrator of the Twelfth Judicial Circuit; (2) Mark Lipinski, an attorney board-certified in criminal law who practiced in Manatee County; and (3) Joseph Campoli, an attorney appointed from the Involuntary Appointment List to represent one of the defendants in the
 
 Agustin
 
 case.
 

 A. Walt Smith
 

 Mr. Smith testified to the shortage of Manatee County attorneys on the registry list to handle large, multidefendant prosecutions under the Florida RICO Act. He described his efforts to find additional attorneys willing to represent some of the accused persons in these cases:
 

 We had ... a larger list under the previous Indigent Services Committee list where it had been an hourly rate. And so we went back to those attorneys who now were off the list who didn’t want to work under the current legislative system. So we went back to them, said, would you take the case, can you do this, and as I said, we didn’t have any takers.
 

 The refusal of the members of the criminal defense bar to take assignments to these cases on a voluntary basis led to the cre^ ation of the Involuntary Appointment List.
 

 B. Gregory Hagopian
 

 Mr. Hagopian was admitted to The Florida Bar in 1993. The circuit court described Mr. Hagopian as “a former prosecutor who is now a prominent and successful solo practitioner. His Bradenton practice is about equally divided between civil and criminal cases[,] and his entire office staff consists of one secretary.” Mr. Hagopian estimated his monthly overhead at $12,000.
 

 Although Mr. Hagopian had not defended a RICO prosecution previously, he did not dispute his competency to handle such a case. Instead, as the circuit court noted, his objections to the appointment were “financial and ethical.” Mr. Hagopian explained the vast scope of the State’s case against Mr. Green with reference to a thirty-four-page discovery exhibit that he had received from the Statewide Prosecutor’s Office:
 

 That is a listing ... of 382 witnesses; 216 law enforcement witnesses, 178 from Manatee County Sheriff, 36 from the Bradenton Police Department, one from [the Florida Department of Law Enforcement], one from the Palmetto Police Department, 155 so-called civilian witnesses, 11 codefendants. If my addition is correct, that’s 382 witnesses that are listed on the discovery exhibit. There are also 176 separate law enfoi-cement police reports listed in that discovery exhibit. There are nine predicate acts listed for my client alone, Mr. Green, and there are a total of [11] codefendants.
 

 Based on the complexity of the case, Mr. Hagopian estimated that it would take a minimum of 500 hours to investigate and prepare the case. This estimate did not include trial time. He expected that a trial could consume an additional two to six weeks. In addition to the demands that the case would place on his time, Mr. Hagopian anticipated that it would be necessary for him to hire an additional secretary to handle the administrative details of the case. However, under the JAC contract, attorneys may not be reimbursed for staff time devoted to a case.
 

 Mr. Hagopian testified in detail about the impact that a case of this magnitude would have on his solo law practice. First, the demands of the case on his time would be so great that he believed he would be unable to effectively represent his existing clients. This would require him to seek to withdraw from matters he had already accepted and to return some retainers. Sec
 
 *633
 
 ond, Mr. Hagopian also expected that the demands of the case would make it impossible for him to accept any new business for a substantial period of time. As a result, Mr. Hagopian explained, “If I were forced against my will to properly defend this individual, it could possibly shut my practice down.”
 

 Mr. Hagopian testified concerning his fee arrangements if he were to handle a similar matter for a private client: “I wouldn’t even touch this case for anything less than $100,000 down, up-front, plus a trial fee of at least $50,000, plus depending on how much more I dig into it, another [$]50 to 100,000 for the work done.” In response to a question from the circuit court, Mr. Hagopian testified that no attorney competent to defend the case would be willing to do the work for $75 per hour or even $110 per hour. After considering all of the circumstances — including the JAC’s payment policies and practices — Mr. Ha-gopian concluded: “[T]here’s just no way that I could possibly do this.”
 

 C. Joseph Campoli
 

 Mr. Hagopian’s reluctance to accept the appointment to Mr. Green’s case was supported by the experience of Joseph Cam-poli. Mr. Campoli, another sole practitioner, had been appointed previously to represent one of the defendants in the
 
 Agustín
 
 case. Like Mr. Hagopian, Mr. Campoli had moved to withdraw from the case to which he was appointed. The circuit court had previously denied his motion. Mr. Campoli testified at the hearing concerning the negative impact of the appointment on his practice as follows:
 

 [ 0]ne thing that needs to be stated is that the current economy of our business with criminal defense attorneys right now, it’s a difficult economy. And so there are fewer private cases coming in the door and when you’re not at your desk and you’re not taking phone calls, you’re losing potential business that you would have normally been able to get, and it’s hurt me in a number of instances where I’ve had an opportunity to receive certain cases that I didn’t get because I was not available.
 

 Mr. Campoli also testified about the problems he had experienced in obtaining payment for his services.
 

 Mr. Campoli’s testimony highlighted an aspect of the JAC’s payment policies that made jail visits to the client a particularly unfair burden on the criminal defense bar. Most members of the criminal defense bar in Manatee County have their offices in Bradenton, the county seat. However, the Manatee County Jail is located across the Manatee River north of Palmetto, a substantial distance from Bradenton. Defense attorneys cannot speak to clients who have been jailed by telephone about anything but the most routine matters because the inmates’ telephone conversations are monitored. In order to speak with the client, the attorney must travel to the jail, clear the security checkpoint, and wait until the client is made available for the visit. Thus a trip to the jail and return to the office occupies a minimum of two hours. Nevertheless, the JAC will not compensate the attorney for travel time to the jail and back to the office.
 

 D. Mark Lipinski
 

 Mr. Lipinski practices law in Manatee County. He has been board-certified in criminal law since 1991 and devotes eighty percent of his practice to criminal law. Mr. Lipinski has experience in defending RICO prosecutions.
 

 Mr. Lipinski testified concerning the complexity of RICO cases in general and Mr. Green’s case in particular. According to Mr. Lipinski, all RICO prosecutions are complex and time-consuming and Mr.
 
 *634
 
 Green’s case appeared to be “one of the more involved ones.” Mr. Lipinski pointed to the large number of codefendants and the extensive witness list as complicating factors in the case. He characterized the number of hours that would be required to investigate the case, prepare it for trial, and conduct the trial as “just astronomical.”
 

 Mr. Lipinski corroborated the testimony of Mr. Hagopian and Mr. Campoli concerning the negative impact of a major case such as Mr. Green’s on the practice of a criminal defense attorney relative to the loss of existing clients and the difficulty of obtaining and accepting new business. Mr. Lipinski also discussed the impact of a lengthy trial on a lawyer’s practice. He had once participated in a federal criminal trial that had lasted three months. As Mr. Lipinski recalled his experience:
 

 I was gone for basically three months and my practice, I didn’t have much of a practice when I came back. I couldn’t accept new clients. People didn’t want to talk to me for very valid reasons[,] and they went to other people.
 

 Because of these and other considerations, Mr. Lipinski testified that his fee to defend a case like Mr. Green’s for a private client would be $300,000 or more.
 

 E. The State’s Response
 

 We note that an attorney for the JAC responded to a number of questions posed by the circuit court at the hearing. However, the State did not present any evidence at the hearing or argue in opposition to Mr. Hagopian’s motion to withdraw. Thus the testimony of Mr. Hagopian, Mr. Campoli, and Mr. Lipinski concerning the complexity of the case against Mr. Green, the colossal effort that it would take to defend it properly, and the negative impact that the involuntary appointment would have on the business of an attorney practicing in a small office was not contradicted.
 

 III. THE ORDER UNDER REVIEW
 

 At the conclusion of the hearing on Mr. Hagopian’s motion to withdraw, the circuit court entered a fourteen-page, single-spaced order. The order contains detailed findings of fact and conclusions of law. In its order, the circuit court struggled to accommodate the competing interests presented by Mr. Hagopian’s desire to preserve his law practice and Mr. Green’s constitutional right to counsel. Although we quash the circuit court’s order, we praise the circuit court for its careful and thoughtful approach to this very difficult matter. The circuit court’s conscientious handling of Mr. Hagopian’s motion to withdraw has made this court’s task much easier.
 

 The circuit court’s order acknowledged the validity of Mr. Hagopian’s concerns about the devastating impact the involuntary appointment to Mr. Green’s case would have on his solo law practice:
 

 From Mr. Hagopian’s perspective, not only is he being forced to accept a blockbuster case that may cause him to lose new and existing paying clients, thereby raising the specter of insolvency, but from what he has heard about the operations of the JAC, beleaguered by budget cuts, staff reductions and short funding of due process costs by the legislature, he has little confidence that his invoices for services and costs will be promptly reviewed and approved. If he has to fight the state bureaucracy and suffer routine delays for payment, he fears he will not be able to maintain the $12,000 monthly income stream required just to keep his office doors open.
 

 These are legitimate and practical concerns.
 

 
 *635
 
 (Emphasis added.) Despite these findings, the circuit court viewed the need to find competent counsel for Mr. Green as its paramount objective. After acknowledging the factual basis for and the legitimacy of Mr. Hagopian’s reasons for moving to withdraw, the circuit court expressed its view as follows: “Yet the stark fact remains: Terry Green needs a lawyerf,] and constitutional imperatives compel the judiciary to devise the means of acquiring one for him.”
 

 In an effort to accommodate the competing interests posed by Mr. Hagopian’s need to maintain his law practice and Mr. Green’s right to counsel, the circuit court devised a detailed plan under which Mr. Hagopian would be compensated for representing Mr. Green. The cornerstone of this plan was the circuit court’s ruling that section 27.5304 was unconstitutional in certain respects as applied to payment for Mr. Hagopian’s services in representing Mr. Green. The circuit court ruled:
 

 This case is “extraordinary and unusual.” The statutory fee, even if increased 200% is inadequate and would be confiscatory of the attorney’s services. Accordingly, the court finds section 27.5304, Florida Statutes (2007)[,] as it relates to the statutory fee cap, the restrictions on judges exceeding the flat fee under certain circumstances, and the requirement that private attorneys wait until the end of the case to receive compensation to be unconstitutional as applied to defendant Terry Green.
 

 Based on this ruling, the circuit court denied Mr. Hagopian’s motion to withdraw and provided detailed guidelines and procedures to be followed relative to compensation for Mr. Hagopian for his representation of Mr. Green.
 

 The guidelines and procedures devised by the circuit court may be summarized as follows:
 

 (1) Mr. Hagopian’s compensation would be paid at the rate of $110 per hour instead of $75 per hour, the maximum hourly rate authorized under section 27.5304 for noncapital cases.
 

 (2) Mr. Hagopian would be allowed to be reimbursed “for unusual [sic] litigation costs, including photocopying or postage expenses related to the case.”
 

 (3) Mr. Hagopian and the JAC were to follow the provisions of section 27.5304(12)(a) relative to the review of invoices and the filing of motions for payment.
 

 (4) Mr. Hagopian would be entitled to submit interim billings when the total hours expended on the case equal or exceed forty hours.
 

 (5) The circuit court also included detailed measures for the prompt review and payment of Mr. Hagopian’s invoices by the JAC.
 

 Finally, the circuit court ordered that the procedures and guidelines announced in Mr. Green’s case would be used as a model for other attorneys appointed from the Involuntary Appointment List in similar circumstances. Following the entry of this order, Mr. Hagopian timely sought review in this court.
 

 IV. THE PARTIES’ ARGUMENTS
 

 A. Mr. Hagopian
 

 Mr. Hagopian presents four arguments in support of his claim that the circuit court departed from the essential requirements of the law in denying his motion to withdraw. First, the involuntary appointment of Mr. Hagopian to Mr. Green’s case results in a significant burden to Mr. Ha-gopian that is not only confiscatory of his time but also compromises his ability to provide ethical and competent representation to the client. Second, the financial burden imposed on Mr. Hagopian by the
 
 *636
 
 appointment is so great that it creates an inherent conflict between him and Mr. Green. Third, whether Mr. Hagopian is forced into a contract with the JAC under the circuit court’s order or is to be paid under the provisions of section 27.5304, the circuit court’s order violates Mr. Hagopi-an’s constitutional right of contract under article I, section 10 of the Florida Constitution. Finally, the involuntary appointment violates various other constitutional rights, including equal protection, due process of law, and the right of association.
 

 Because we agree that Mr. Hagopian established grounds to withdraw under rule 4-6.2 of the Rules Regulating The Florida Bar, we need not address his constitutional arguments. However, we note that the Supreme Court of Florida has previously rejected similar constitutional objections to the involuntary appointment of lawyers to represent the indigent.
 
 See In re Amendments to Rules Regulating The Florida Bar-1-3.1(a) and Rules of Judicial Adminstration-2.065 (Legal Aid),
 
 573 So.2d 800, 805 (Fla.1990).
 

 B. The JAC
 

 In its response to Mr. Hagopian’s petition, the JAC notes that it participated in the hearing in the circuit court “solely to preserve its objections to compensation inconsistent with the parameters of Chapter 27[,] particularly sections 27.40 and 27.5304, Florida Statutes (2007).”
 
 [5]
 
 The JAC takes no position on whether the circuit court departed from the essential requirements of the law in denying Mr. Ha-gopian’s motion to withdraw.
 
 [6]
 

 C. Mr. Green
 

 Mr. Green filed a response to the petition through counsel.
 
 [7]
 
 In Mr. Green’s response to the petition, he argues that a conflict of interest has arisen between him and Mr. Hagopian that lias — in effect — left Mr. Green without representation. Mr. Green asserts that he has suffered irreparable harm caused by the inability of the circuit court to provide him with competent and conflict-free counsel.
 
 [8]
 
 Mr. Green asks us to remand this case to the circuit court with instructions to dismiss with prejudice the charges against him. This we cannot do. We have only Mr. Hagopi-an’s petition before us, and Mr. Green sought no such relief in the circuit court.
 

 V. PRELIMINARY MATTERS
 

 Mr. Hagopian’s petition for writ of certiorari is the appropriate method to obtain review of the circuit court’s denial of the motion to withdraw.
 
 See Stoudimire v. State,
 
 760 So.2d 985, 986 (Fla. 5th DCA 2000). We apply a three-part test to determine whether we can grant relief by certiorari from an erroneous interlocutory order. “A petitioner must establish (1) a departure from the essential requirements of the law, (2) resulting in material injury for the remainder of the trial (3) that cannot be corrected on postjudgment ap
 
 *637
 
 peal.”
 
 Parkway Bank v. Fort Myers Armature Works, Inc.,
 
 658 So.2d 646, 648 (Fla. 2d DCA 1995). The second two parts of the test are jurisdictional. We must conduct the jurisdictional analysis before we are empowered to grant relief on the merits, i.e., whether the nonfinal order departs from the essential requirements of the law.
 
 Id.
 
 at 649.
 

 Here, the injury that Mr. Hagopian will sustain as a result of an improper denial of his motion to withdraw cannot be remedied on appeal. Thus the focus of our inquiry must be on whether the circuit court departed from the essential requirements of the law in denying Mr. Hagopi-an’s motion to withdraw. In conducting this review, we bear in mind that “the scope of review by common-law certiorari is traditionally limited and much narrower than the scope of review on appeal.”
 
 Haines City Cmty. Dev. v. Heggs,
 
 658 So.2d 523, 526 n. 3 (Fla.1995).
 

 For the purpose of our review of Mr. Hagopian’s challenge to the order denying his motion to withdraw, we will assume that the JAC would comply with the detailed procedures and guidelines for payment outlined in the circuit court’s order. However, we note that the JAC has filed a petition for writ of certiorari challenging the circuit court’s order imposing the hourly rate of $110 and allowing interim billings. The JAC’s petition also challenges the trial court’s order directing it to pay Mr. Hagopian despite his refusal to sign the JAC’s proffered contract and directing the JAC to pay attorney’s fees for work it alleges was done outside the scope of Mr. Hagopian’s representation of Mr. Green. The JAC’s petition provides support for Mr. Hagopian’s concerns about the difficulties he anticipates in obtaining payment for his services from the JAC.
 

 VI. THE APPLICABLE LAW
 

 We take it as a given that the circuit court has the power to make involuntary appointments of members of The Florida Bar to represent indigent persons in criminal prosecutions.
 
 See In re Amendments,
 
 573 So.2d at 804-05. However, counsel for the accused is entitled to receive reasonable compensation. In the landmark case of
 
 Makemson v. Martin County,
 
 491 So.2d 1109, 1112 (Fla.1986), the Supreme Court of Florida held that a trial court had the power to exceed statutory fee caps in order to ensure reasonable compensation for attorneys who had represented the defendant in a capital case. In reaching its decision on the unconstitutionality of the fee caps as applied, the court focused on the link between the attorney’s right to fair compensation and the defendant’s right to adequate representation:
 

 [ W]e find that the statutory maximum fees, as inflexibly imposed in cases involving unusual or extraordinary circumstances, interfere with the defendant’s sixth amendment right “to have the assistance of counsel for his defence.” The statute, as applied to many of today’s cases, provides for only token compensation. The availability of effective counsel is therefore called into question in those cases when it is needed most.
 

 Id.
 
 The court also based its decision on “[cjertain pressing realities” that could not be ignored.
 
 Id.
 
 at 1114. The first of these was the increasing complexities of current criminal law that required additional time and effort to represent the accused.
 
 Id.
 
 The second was rising costs, resulting in circumstances where the statutory maximum fee would be insufficient to cover the attorney’s overhead.
 
 Id.
 

 In a later case, the court reaffirmed its holding in
 
 Makemson
 
 and held that another attorney who represented a defendant in a capital case was entitled to fees ex
 
 *638
 
 ceeding the statutory maximum.
 
 See White v. Bd. of County Comm’rs,
 
 537 So.2d 1376 (Fla.1989). In its opinion in the
 
 White
 
 case, the court further explained the link between the defendant’s right to effective representation and the attorney’s right to reasonable compensation first stated in
 
 Malcemson:
 

 It must be remembered that an indigent defendant’s right to competent and effective representation, not the attorney’s right to reasonable compensation, gives rise to the necessity of exceeding the statutory maximum fee cap. The relationship between an attorney’s compensation and the quality of his or her representation cannot be ignored. It may be difficult for an attorney to disregard that he or she may not be reasonably compensated for the legal services provided due to the statutory fee limit. As a result, there is a risk that the attorney may spend fewer hours than required representing the defendant or may prematurely accept a negotiated plea that is not in the best interests of the defendant. A spectre is then raised that the defendant received less than the adequate, effective representation to which he or she is entitled, the very injustice appointed counsel was intended to remedy.
 

 Id.
 
 at 1379-80 (citation omitted). In this regard, the
 
 White
 
 court also noted the importance of examining the impact of the court-appointed representation on the attorney’s ability to serve his or her other clients and on his or her law practice.
 
 Id.
 
 at 1380. In subsequent decisions involving attempts to exceed a statutory cap on attorney’s fees for representation of indigent persons, the court has adhered to its
 
 Makemson
 
 rationale and continued to emphasize the inextricable connection between fair compensation for the attorney and effective representation for the client.
 
 See Maas v. Olive,
 
 992 So.2d 196, 202-03 (Fla.2008);
 
 Olive v. Maas,
 
 811 So.2d 644, 651-54 (Fla.2002);
 
 Remeta v. State,
 
 559 So.2d 1132, 1135 (Fla.1990).
 

 However, Mr. Hagopian’s case differs from
 
 Malcemson
 
 and its progeny in an important respect. In these cases, the attorneys had completed the representation of the client and were requesting fees in excess of a statutory cap. Here, Mr. Hagopian is not requesting fees for a representation that has been completed. Instead, he is seeking to be relieved of the representation of Mr. Green at the outset of the case. In addition, we do not face a situation where Mr. Hagopian originally signed a contract with the JAC and subsequently seeks to be relieved of the burden of some or all of the contractual terms.
 
 Cf. Fla. Dep’t of Fin. Servs. v. Freeman,
 
 921 So.2d 598, 607-08 (Fla.2006) (Cantero, J., concurring) (suggesting that where counsel signs a contract that incorporates a statutory fee structure, paying counsel the contractual rate for foreseeable work cannot be considered “confiscatory”);
 
 Hillsborough County v. Unterberger,
 
 534 So.2d 838, 841 (Fla. 2d DCA 1988) (finding that there was no showing that a $40 hourly rate for an attorney appointed to represent a defendant on an appeal from a first-degree murder conviction and sentence of death denied adequate representation or deprived indigent criminal defendants of their rights to counsel where the evidence showed that the attorney had agreed to represent the defendant at that hourly rate);
 
 Sheppard & White, P.A. v. City of Jacksonville,
 
 751 So.2d 731, 733-36 (Fla. 1st DCA 2000) (finding that a very low hourly rate awarded to an attorney for successfully handling an appeal to the Supreme Court of Florida of a first-degree murder conviction and sentence of death was not confiscatory where the evidence showed among other things that the attorney “was not required to take [the] case
 
 *639
 
 and that, once he accepted representation, he knew ‘going in that it [would] be reimbursed at $40 per hour’ ” (second alteration in original)),
 
 approved,
 
 827 So.2d 925 (Fla.2002). On the contrary, Mr. Hagopi-an has not only consistently objected to his involuntary appointment to Mr. Green’s case, he has also steadfastly refused to sign the JAC’s proffered contract. Thus, in reviewing the circuit court’s denial of Mr. Hagopian’s motion to withdraw, we must look beyond
 
 Makemson
 
 and its progeny. However, the principles stated in these cases remain important to our review of this issue.
 

 The oath of admission to The Florida Bar, which is taken by every individual before he or she is admitted to practice law in Florida, provides, in pertinent part: “I will never reject, from any consideration personal to myself, the cause of the defenseless or oppressed .... ”
 
 Rules of the Supreme Court relating to Ethics Governing Bench and Bar of Florida,
 
 145 Fla. 763, 797-98 (1941). Consistent with the high purpose of the oath, the Supreme Court of Florida has held that a lawyer has an obligation to represent indigent persons when called upon to do so by a court.
 
 See In re Amendments,
 
 573 So.2d at 806. While stating that a lawyer may not challenge an involuntary appointment on constitutional grounds, the court also noted “that a lawyer may challenge a court appointment on the grounds of abuse of discretion, such as where a court takes a substantial portion of the lawyer’s available services for such appointments.”
 
 Id.
 
 at 805. The court went on to note that the proper method for a lawyer to challenge an involuntary appointment is set forth in rule 4-6.2, Rules Regulating The Florida Bar.
 
 Id.
 
 at 805-06.
 

 Rule 4-6.2 addresses the issue of accepting court appointments. The rule states:
 

 A lawyer shall not seek to avoid appointment by a tribunal to represent a person except for good cause, such as when:
 

 (a) representing the client is likely to result in violation of the Rules of Professional Conduct or of the law;
 

 (b) representing the client is likely to result in an unreasonable financial burden on the lawyer; or
 

 (c) the client or the cause is so repugnant to the lawyer as to be likely to impair the client-lawyer relationship or the lawyer’s ability to represent the client.
 

 The Comment to the rule provides, in pertinent part, “A lawyer may also seek to decline an appointment if acceptance would be unreasonably burdensome, for example, when it would impose a financial sacrifice so great as to be unjust.”
 

 A recent ethics opinion from the American Bar Association (the ABA) provides additional guidance in this area.
 
 See
 
 ABA Comm, on Ethics and Profl Responsibility, Formal Op. 06-441 (2006), available at www.abanet.org/cpr/06 — 441.pdf (“Ethical Obligations of Lawyers Who Represent Indigent Criminal Defendants When Excessive Caseloads Interfere with Competent and Diligent Representation”). The ABA opinion notes that public defenders and other lawyers appointed to represent indigent persons have an obligation to manage their workloads so that they can provide effective representation to their clients. In pertinent part, the opinion advises:
 

 A lawyer’s primary ethical duty is owed to existing clients. Therefore, a lawyer must decline to accept new cases, rather than withdraw from existing cases, if the acceptance of a new case will result in her workload becoming excessive. When an existing workload does become excessive, the lawyer must reduce it to the extent that what re
 
 *640
 
 mains to be done can be handled in full compliance with the Rules.
 

 When a lawyer receives appointments directly from the court rather than as a member of a public defender’s office or law firm that receives the appointment, she should take appropriate action if she believes that her workload will become, or already is, excessive.
 

 Id.
 
 at 4-5. The opinion provides specific guidance concerning what such lawyers should do if excessive caseloads interfere with their ability to provide all of their clients with effective representation.
 
 Id.
 
 at 5-6. The advice offered in the opinion is consistent with the more general guidelines stated in rule 4-6.2.
 
 See generally
 
 Jessica Hafkin,
 
 A Lawyer's Ethical Obligation to Refuse New Cases or to Withdraw from Existing Ones When Faced with Excessive Caseloads that Prevent Him from Providing Competent and Diligent Representa,lion to Indigent Defendants,
 
 20 Geo. J. Legal Ethics 657 (2007) (analyzing ABA Formal Opinion No. 06-441 and discussing the feasibility of its solutions for reducing indigent defender caseloads and the proper role of the courts in this effort).
 

 VII. DISCUSSION
 

 A. Exploring the Problem
 

 With this legal background in mind, we turn now to an examination of the problem that the circuit court confronted in attempting to secure counsel for Mr. Green. The hard realities underlying this case stem from the conjunction of two factors: (1) the enormous scope and complexity of the RICO prosecution against Mr. Green and (2) the inadequacy of the existing compensation system to pay an attorney from a small office to provide effective representation in such a case and to maintain his or her law practice. We will examine each of these factors separately below.
 

 1. The RICO Prosecution. The stated purpose of the federal RICO Act, 18 U.S.C. §§ 1961-1968, was to address the problem of organized crime, particularly its infiltration and corruption of legitimate business and labor unions.
 
 See
 
 Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 922-28 (1970) (codified as amended at 18 U.S.C. §§ 1961-1968 (2006)).
 
 See generally
 
 Gerard E. Lynch,
 
 RICO: The Crime of Being a Criminal (pts. I-IV),
 
 87 Colum. L. Rev. 661, 920 (1987) (discussing the legislative history of the federal RICO Act and examining the federal Act and its uses in detail). The Florida RICO Act was patterned after the federal RICO Act.
 
 See Gross v. State,
 
 765 So.2d 39, 42 (Fla.2000). Like the federal RICO Act, the declared purpose of the Florida RICO Act was to target organized crime and its infiltration and corruption of legitimate business.
 
 See
 
 ch. 77-334, preamble, at 1400, Laws of Fla.
 
 See generally
 
 Jennifer Daley,
 
 Tightening the Net of Florida’s RICO Act,
 
 21 Fla. St. U.L. Rev. 381 (1993) (discussing the Florida RICO Act).
 

 Despite the declared purpose of the federal and Florida RICO Acts, the reach of these laws is not limited to organized crime. For a number of years, prosecutors around the United States have used the federal RICO Act to prosecute members of street gangs.
 
 See
 
 John Gibeaut,
 
 Gang Busters,
 
 84 A.B.A. J. 64 (Jan. 1998). In 1994, the Florida Rico Act was amended to specifically authorize the use of the statute to target street gangs. To accomplish this end, section 895.02(l)(a) was amended to include violations of chapter 874, relating to criminal street gangs, within the meaning of the term “racketeering activity.” Ch. 94-209, § 78, at 1319-20, Laws of Fla. Similarly, section 895.02(3) was also amended to provide that “[a] criminal street gang, as defined in s.
 
 *641
 
 874.03, constitutes an enterprise.”
 
 Id.
 
 at 1320.
 

 At least in Manatee County, the use of the Florida RICO Act to target street gang activity is novel.
 
 [9]
 
 When asked to explain what led to the creation of the Involuntary Appointment List in the Twelfth Judicial Circuit, Walt Smith, the trial court administrator, testified at the hearing:
 

 What really came, what spurred it was the efforts in Manatee County to go after gang prosecutions using the RICO standard. Up until that time we might have had a couple of cases in the last 10 or 15 years that had more than three defendants, you know, three or four defendants, and then with the RICO strategy used by the Statewide Prosecutor and the law enforcement officials in Manatee County, we got our first RICO case and it had 14 defendants. And we had the [OCCCRC] was just coming into being and we had, I believe, five or seven attorneys in Manatee County who were on the court-appointed list. So after we exhausted that, we realized there wouldn’t be enough and that we need to create a list that would include attorneys that we could appoint to these cases.
 

 In the order under review, the circuit court described the aggressive law enforcement efforts undertaken in Manatee County to target alleged street gang organizations as having a “profound impact” on the efficiency of court operations. Thus the recent use of the Florida RICO Act to target criminal street gangs in Manatee County presented the circuit court with difficulties not previously encountered in finding private lawyers to represent the indigent accused in multidefendant prosecutions.
 

 A factor common to virtually all RICO prosecutions is their complexity. “A RICO prosecution necessarily involves a series of alleged criminal offenses that occur over a period of time implicating a number of different individuals. Thus, the amount of time and effort involved in the investigation and trial preparation is enormous.” David T. Butsch,
 
 Forfeiture of Attorney Fees Under RICO’s New Amendments,
 
 32 St. Louis U. L.J. 199, 212 (1987). At the hearing that led to the entry of the order under review, the undisputed evidence established the complexity of the State’s case against Mr. Green.
 

 The complex nature of RICO prosecutions has led courts and commentators to question the ability of appointed counsel to provide competent representation in such cases. One federal district judge has declared:
 

 The costs of mounting a defense of an indictment under RICO are far beyond the resources or expertise of the average federal public defender’s office which is already over taxed. Ignoring the complexity of the legal issues involved, the defense of RICO accusations requires the marshalling of facts and information of vast quantities perhaps constituting the whole of several worldwide business enterprises. The government brings to bear significant resources to prosecute these cases.
 

 United States v. Rogers,
 
 602 F.Supp. 1332, 1349 (D.Colo.1985).
 
 [10]
 
 A commentator has expressed a similar view:
 

 
 *642
 
 Appointed counsel is probably unable to mount a suitable defense for a RICO or [Continuing Criminal Enterprise, 21 U.S.C. § 848] defendant. The length and complexity of these defenses make the public defender offices, which already lack the human resources to perform the requisite preparatory work, incapable of countering the effort of the Justice Department.
 

 Steven C. Bauman,
 
 United States v. Monsanto: The Supreme Court Swings and Misses
 
 —Attorney
 
 Fee Forfeiture Under RICO and CCE,
 
 10 Pace L.Rev. 439, 472 n. 207 (1990). Whether or not one agrees with these assessments, they speak to the extraordinary effort required of any single lawyer called upon to defend a RICO prosecution.
 

 2. The Impact of the Appointment on Mr. Hagopian. In considering the circuit court’s denial of the motion to withdraw, we must put aside nostalgic conceptions of the practice of law in order to make a realistic assessment of what the involuntary appointment to Mr. Green’s case actually meant for Mr. Hagopian and his solo law practice. For many people, lawyers and nonlawyers alike, the appointment of a lawyer from the private bar to represent an unpopular defendant accused of a serious crime brings to mind the image of Atticus Finch, the hero of Harper Lee’s Pulitzer Prize-winning novel,
 
 To Kill a Mockingbird
 
 (J.B. Lippincott & Co. 1960). Atticus Finch defended Tom Robinson, an indigent man charged with rape, “without mention of a fee, perpetuating in the eyes of readers everywhere the noble image of the lawyer dedicated to justice with no thought of ... ‘lucre.’ ”
 
 Arnold v. Kemp,
 
 306 Ark. 294, 813 S.W.2d 770, 780 (1991) (Newbern, J., concurring). But the practice of law has changed drastically since the 1930s when the fictional Atticus Finch practiced law.
 

 A number of factors have combined to increase the burden of involuntary appointments to criminal cases on members of the private bar in the modern era. First, the practice of criminal law has become increasingly complex and specialized.
 
 See
 
 Christopher D. Atwell, Comment,
 
 Constitutional Challenges to Court Appointment: Increasing Recognition of an Unfair Burden,
 
 44 Sw. L.J. 1229, 1242-43 (1990). Second, as the practice of law has changed, costs for personnel, libraries, equipment, and general overhead have increased significantly.
 
 See id.
 
 at 1243. Lawyers have also become expected to use computer-assisted legal research to ensure that their research is complete and up-to-date, but the costs of this service can be significant.
 
 See
 
 Michael Whiteman,
 
 The Impact of the Internet and Other Electronic Sources on an Attorney’s Duty of Competence under the Rules of Professional Conduct,
 
 11 Alb. L.J. Sci. & Tech. 89, 103 (2000) (concluding that computer-assisted legal research “has become recognized as a standard research technique among judges, lawyers[,] and law students, with price being perhaps the only thing holding back all attorneys from utilizing it in their research”). The lawyer’s need to generate fees to pay these costs makes it more difficult to undertake appointed work for a reduced fee or for no fee at all. Third, competition among lawyers for business has become intense.
 
 See
 
 Atwell, 44 Sw. L.J. at 1243. Such competition makes it more difficult for a lawyer with a small office to undertake appointed work and continue to sustain his or her law practice.
 

 
 *643
 
 These factors formed the backdrop for the testimony in the circuit court from Mr. Hagopian, Mr. Campoli, and Mr. Lipinski concerning the devastating impact that an involuntary appointment to a case such as Mr. Green’s would have on an attorney in a solo or small law practice. Because Mr. Campoli had previously been involuntarily appointed to represent one of the defendants in the
 
 Agustín
 
 case, he testified from direct experience. The three attorneys identified the following negative factors of the involuntary appointment: (1) the enormous amount of time necessary to prepare and try the case; (2) the inadequacy of even the enhanced rate of $110 per hour proposed by the circuit court; (3) the likely loss of existing business and the need to return retainers already accepted; (4) the inability to obtain or accept new business; (5) the refusal of the JAC to pay for travel time, computer-assisted legal research, ordinary out-of-pocket expenses, and staff time; (6) the expectation of encountering difficulties in obtaining payment from the JAC; and (7) anticipated obstacles in obtaining approval and payment for necessary expert witnesses. This testimony was not contradicted or disputed. Indeed, the circuit court described the concerns expressed by Mr. Hagopian about the involuntary appointment as “legitimate and practical.”
 

 B. Applying the Law to the Problem
 

 After a thorough consideration of the record in this extraordinary case, we conclude that Mr. Hagopian established two grounds under rule 4-6.2 supporting his withdrawal from further representation of Mr. Green. The three grounds described in the rule constitute a nonex-elusive list of “circumstances that would justify ‘good cause’ to avoid court-ordered appointments.”
 
 In re Amendments,
 
 573 So.2d at 806. First, under rule 4-6.2(a), a lawyer may seek to avoid appointment by a court to represent a person when “representing the client is likely to result in violation of the Rules of Professional Conduct or of the law.” The undisputed evidence presented at the hearing established that the continued representation of Mr. Green by Mr. Hagopian would likely result in the violation of several of the Rules of Professional Conduct.
 

 Rules 4-1.1, 4-1.2(a), 4-1.3, and 4-1.4 of the Rules of Professional Conduct
 

 require lawyers to provide competent representation, abide by certain client decisions, exercise diligence, and communicate with the client concerning the subject of representation. These obligations include, but are not limited to, the responsibilities to keep abreast of changes in the law; adequately investigate, analyze, and prepare cases; act promptly on behalf of clients; communicate effectively on behalf of and with clients; control workload so each matter can be handled competently; and, if a lawyer is not experienced with or knowledgeable about a specific area of the law, either associate with counsel who is knowledgeable in the area or educate herself about the area. The Rules provide no exception for lawyers who represent indigent persons charged with crimes.
 

 ABA Formal Op. 06-441 at 3 (footnotes omitted).
 
 [11]
 
 The comment to rule 4-1.3 states, in pertinent part: “A lawyer’s
 
 *644
 
 workload must be controlled so that each matter can be handled competently.”
 

 Here, the undisputed evidence established that the involuntary appointment to Mr. Green’s case would make it impossible for Mr. Hagopian to handle the legal business of his existing clients and provide them with competent representation. Such derelictions by Mr. Hagopian would result in the violation of rules 4-1.1, 4-1.2(a), 4-1.3, and 4-1.4. Under these circumstances, Mr. Hagopian established good cause for moving to withdraw from Mr. Green’s case.
 
 See In re Amendments,
 
 573 So.2d at 806; ABA Formal Op. 06-441 at 4-5.
 

 Second, under rule 4-6.2(b), a lawyer may seek to avoid an appointment by a court to represent a person when “representing the client is likely to result in an unreasonable financial burden on the lawyer.” Here, the undisputed evidence established that the extraordinary time and effort that would be required to represent Mr. Green effectively — together with the minimal and uncertain compensation offered-threatened Mr. Hagopian with the ruin of his successful solo law practice. By any standard, the involuntary appointment to Mr. Green’s defense was an unreasonable financial burden for Mr. Hagopian.
 

 To be sure, under the circuit court’s order, Mr. Hagopian was to be compensated at a higher rate for indigent defense than section 27.5304(12)(d) authorized— $110 per hour instead of $75 per hour. Still, the $110 hourly rate was substantially below the market rate for a successful lawyer such as Mr. Hagopian.
 
 [12]
 
 Moreover, the $110 per-hour rate would not make up for losses resulting from time and resources devoted to the representation for which no compensation would be paid.
 

 Furthermore, a focus on the enhanced hourly rate proposed by the circuit court overlooks the cost to Mr. Hagopian of the preclusion of other employment caused by the involuntary appointment. Generally speaking, payment at a below-market hourly rate for the defense of an indigent accused will be adequate in a routine felony prosecution. A criminal defense attorney can accept a routine case for a reduced fee and fit it into the balance of his or her practice. But the vast scope of Mr. Green’s case threatened to overwhelm Mr. Hagopian’s small office, requiring him to devote substantially all of his productive time to the case for an extended period. Under these circumstances, the hourly rate of $110 is inadequate because it does not replace income lost due to Mr. Hagopi-an’s inability to handle the business of private clients who pay the market rate for his services.
 

 When a lawyer is required to work exclusively on a single client’s business for an extended period of time, work for existing clients must generally be postponed or referred to other attorneys. While the lawyer is working exclusively on one client’s affairs, it is difficult — if not impossible — to accept new business. For such work on behalf of a single client performed
 
 *645
 
 on a “crash basis,” the lawyer ought to receive a premium above his or her normal fee to compensate for the disruption to the lawyer’s practice.
 
 See
 
 Mark W. Klingensmith,
 
 Attorney-Client Relationship
 
 § 1.19, in
 
 Florida Civil Practice Before Trial
 
 (Fla. Bar CLE 8th ed. 2009);
 
 see also
 
 R. Regulating Fla. Bar 4-1.5(b)(1)(B) (“Factors to be considered as guides in determining a reasonable fee include ... the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.”). The circumstances of the involuntary appointment of Mr. Hagopian to Mr. Green’s case turn basic law office economics on its head by requiring Mr. Hagopian to work for one client on a “crash basis” at a rate substantially below the market rate for similar services.
 

 For these reasons, Mr. Hagopian established grounds for withdrawal from further representation of Mr. Green under rule 4-6.2. The circuit court departed from the essential requirements of the law in denying Mr. Hagopian’s motion to withdraw.
 

 C. The Limits of our Decision
 

 Before concluding, we address two matters pertinent to the limits of our decision. First, we emphasize the extraordinary nature of this case. Our decision to grant the petition and quash the circuit court’s order is based on the undisputed evidence presented in the circuit court concerning the unusual complexity of the RICO prosecution against Mr. Green and the ruinous effect the involuntary appointment will have on Mr. Hagopian’s solo law practice. Our decision should not be read as granting lawyers a free pass to avoid unwanted appointments to represent indigent persons in more conventional prosecutions.
 

 Second, we understand that our decision does not resolve the problem presented by this ease. Mr. Green needs a lawyer, and he will not have the benefit of Mr. Hagopi-an’s services. However, the only matter before us is whether the circuit court departed from the essential requirements of the law in denying Mr. Hagopian’s motion to withdraw. We hold that it did, and we grant Mr. Hagopian’s petition for writ of certiorari.
 

 Unfortunately, no member of the criminal defense bar has volunteered to represent Mr. Green in the circuit court. At the conclusion of the hearing in the court below, the circuit judge remarked on the difficulties he had encountered in finding counsel for Mr. Green and expressed his hope that Mr. Green would soon have a lawyer. We appreciate the substantial efforts the circuit judge has made in this regard, and we share the concern he has expressed about finding counsel for Mr. Green.
 

 VIII. CONCLUSION
 

 For the reasons stated above, we grant the petition and quash the circuit court’s order denying Mr. Hagopian’s motion to withdraw.
 

 Petition granted, order quashed, and case remanded for further proceedings.
 

 FULMER and DAVIS, JJ., Concur.
 

 [1]
 

 . Mr. Hagopian's petition is entitled "Petition for Writ of Certiorari or in the Alternative Petition for Writ of Prohibition.” We treat his petition as a petition for writ of certiorari.
 

 [2]
 

 . The discussion of the changes to the manner in which private counsel are compensated on behalf of their services for indigent criminal defendants follows the analysis in the circuit court's order.
 

 [3]
 

 . A recent survey of Florida lawyers found that "91 percent of respondents list their hourly rate at $150 or higher (up from 83 percent in 2005), 69 percent report they charge $200 or more (up from 60 percent), and 18 percent bill $300 or more an hour, the same as two years ago." Mark D. Killian,
 
 Lawyers’ Income is Flat as Firms Brace for Lean Times,
 
 Fla. B. News, Feb. 1, 2009, at 8.
 

 [4]
 

 . Although Mr. Hagopian styled his filing as an ‘'objection,” it was — in effect — a motion to withdraw from Mr. Green’s case. For this reason, we will refer to Mr. Hagopian’s ‘‘objection” as a motion to withdraw in the balance of this opinion.
 

 [5]
 

 . The JAC has filed a separate petition for certiorari from another order challenging various aspects of the payment arrangements for Mr. Hagopian ordered by the circuit court. This petition is pending in this court under case number 2D09-98.
 

 [6]
 

 . We note that the State did not oppose Mr. Hagopian's motion to withdraw in the circuit court.
 
 Cf. State v. Public Defender,
 
 12 So.3d 798, 800-01 (Fla. 3d DCA 2009) (holding that the State had standing to oppose motions to withdraw filed by the public defender).
 

 [7]
 

 . We commend Kevin T. Beck and Todd A. Foster, both of Tampa, for undertaking the representation of Mr. Green in this court.
 

 [8]
 

 . On November 18, 2008, the circuit court entered an order staying further proceedings against Mr. Green pending the outcome of this proceeding.
 

 [9]
 

 . Although the 1994 amendments to the Florida RICO Act have now been in effect for fifteen years, our research has disclosed only one reported Florida case involving a prosecution for racketeering against a defendant identified in the opinion as a member of a criminal street gang.
 
 See Jackson v. State,
 
 858 So.2d 1211 (Fla. 3d DCA 2003).
 

 [10]
 

 .
 
 But see In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985,
 
 605 F.Supp. 839,
 
 *642
 
 853 n. 19 (S.D.N.Y.1985) (“This court does not concur in the court’s statement in
 
 Rogers ...
 
 that appointed counsel is inherently inadequate to represent a defendant on a RICO or 848 [Continuing Criminal Enterprise, 21 U.S.C. § 848] count.’’).
 

 [11]
 

 . The quoted text refers to the ABA Model Rules of Professional Conduct, not the Florida Rules of Professional Conduct. However, the Florida Rules are a modified version of the ABA Model Rules.
 
 See State v. Cote,
 
 538 So.2d 1356, 1357 (Fla. 5th DCA 1989). The Florida rules mentioned are similar to the corresponding versions of the ABA Model Rules.
 

 [12]
 

 . There was no evidence presented at the hearing concerning what a reasonable hourly rate would have been for the defense of Mr. Green's case. We doubt that very many members of the criminal defense bar would have accepted such a case for a private client on the basis of a fee calculated at an hourly rate. Both Mr. Hagopian and Mr. Lipinski testified that they would have insisted on the payment of a very substantial retainer before accepting such a case. In response to a question posed by the JAC's attorney to Mr. Hago-pian concerning whether he would enter into a contract with the JAC, Mr. Hagopian initially responded negatively and then added: "You want to put $200,000 in my trust [account], then I will, and I'll bill off of it at [$]250 an hour. If you're willing to do that, I'm willing to enter into the contract.''